## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## COLUMBIA DIVISION

| | | |
|---|---|---|
| **WILLIAM RAY WHITE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | NO. 1:18-cv-00093 |
| | ) | |
| **RIC WILSON, et al.,** | ) | **JUDGE CAMPBELL** |
| | ) | **MAGISTRATE JUDGE FRENSLEY** |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

## I.  INTRODUCTION

Pending before the Court are a Motion for Partial Summary Judgment filed by Defendants Harold Robertson, Harold Robertson and Associates Bail Bonding, and David Butler (Doc. No. 68), and Plaintiffs' Response (Doc. No. 81). Also pending before the Court are Defendant Donnie Carroll's Motion for Summary Judgment (Doc. No. 69), Plaintiffs' Response (Doc. No. 82), and Defendant Carroll's Reply (Doc. No. 87).

For the reasons set forth below, the Motion for Partial Summary Judgment filed by Defendants Harold Robertson, Harold Robertson and Associates Bail Bonding, and David Butler (Doc. No. 68) is **DENIED**; and Defendant Donnie Carroll's Motion for Summary Judgment (Doc. No. 69) is **GRANTED** in part, and **DENIED** in part. The Court grants summary judgment to Defendant Carroll on Count Three. All other claims remain for trial.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Through their Complaint (Doc. No. 1), Plaintiffs William Ray White, Bernice R. White, and Tiffany Jones bring claims for violation of their federal constitutional rights, as well as state

law claims, arising out of two separate incidents in which certain of the defendants entered their home. Plaintiffs named as defendants Harold Robertson and Associates Bail Bonding, and its owner/employees Harold Robertson and David Butler ("the bondsmen defendants"); ABC Fugitive Recovery Corporation and its employees, Roosevelt Jones, and John Doe Bounty Hunter ("the bounty hunter defendants"); Wayne County, Tennessee, the Wayne County Sheriff's Department, Ric Wilson, former Sheriff of Wayne County, and Sheriff's Department employees Dusty Malugen and Donnie Carroll.

Plaintiffs William and Bernice White allege the bondsmen defendants visited and entered their home on December 20, 2017, while searching for Keith Staggs, who had failed to appear for a court proceeding. The Whites, along with Plaintiff Tiffany Jones (Mrs. White's daughter, who was staying with them), allege the bondsmen returned to their home on December 27, 2017, along with the bounty hunter defendants, in search of Mr. Staggs. Plaintiffs allege the bondsmen and the bounty hunters, who were carrying firearms and wearing bulletproof vests and "badges," entered their property and home without permission, detained them at gunpoint, questioned them, and searched their home and property. During the search, the bounty hunters discovered firearms and marijuana. Because Mr. White had allegedly angered the bounty hunters, one of the bondsmen called Deputies Malugen and Carroll and asked them to come to the scene. After seizing the guns and marijuana, the deputies arrested Mr. White and took him to jail. Later that same day, the bondsmen/bounty hunters apprehended Mr. Staggs in Lewis County.

The Complaint asserts 10 claims arising out of these allegations: (1) "Negligence, Gross Negligence, and Willful and Wanton Misconduct" against Defendants Robertson, Butler, Jones, Doe, Malugen, and the Wayne County Sheriff's Department (Count One); (2) "Violation of Federal Civil Rights 42 U.S.C. § 1983 – Right to be Secure From Unreasonable Search and Seizure

2

– Fourth Amendment; Art. 1 § 7, Tennessee Constitution" (Count Two) against all Defendants; (3) "Violation of Federal Civil Rights 42 U.S.C. § 1983 – Pattern and Practice – Fourteenth Amendment" against Defendants Wayne County Sheriff's Department, Wilson, Malugin, and Carroll (Count Three); (4) Trespass against all Defendants (Count Four); (5) Intentional Infliction of Emotional Distress against Defendants Robertson, Butler, Jones, Doe, and Malugen (Count Five); (6) Assault and Battery against Defendants Robertson, Butler, Jones, and Doe (Count Six); (7) False Imprisonment against Defendants Robertson, Butler, Jones, Doe, and Malugen (Count Seven); (8) Conspiracy against Defendants Robertson, Butler, Jones, Doe, Carroll, and Malugen (Count Eight); (9) Intentional Infliction of Emotional Distress against Defendants Robertson, Butler, Jones, Doe, and Malugen (Count Nine); and (10) Invasion of Privacy against Defendants Robertson, Butler, Jones, Doe, and Malugen (Count Ten). (*Id.* ¶¶ 62-107).

Through previous Orders (Doc. Nos. 52, 53, 96), the Court granted the dismissal of Defendants Wayne County, Wayne County Sheriff's Department, Ric Wilson, Roosevelt Jones, ABC Fugitive Recovery Corporation, and John Doe. (Doc. Nos. 52, 53, 96). The Court also granted dismissal of Count Nine, and the Tennessee Constitutional claim raised in Count Two. (*Id.*)

## III.  ANALYSIS

### A.  <u>The Standards Governing Motions for Summary Judgment</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

3

party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve*, 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

**B.** **The Motion for Partial Summary Judgment filed by Defendants Harold Robertson, Harold Robertson and Associates, and David Butler**

Through their pending motion, the bondsmen defendants argue they are entitled to summary judgment on Plaintiffs' Section 1983 claim against them (Count Two) because they were not acting under color of state law at the time the alleged events took place.

In order to establish a claim for relief under Section 1983, a plaintiff must show: (1) he or she was deprived of a right secured by the Constitution or federal law; and (2) the deprivation was committed by a person acting under color of state law. *See, e.g., Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999); *Toth v. City of Toledo*, 480 Fed. Appx. 827, 831-32 (6th Cir. 2012). In order to meet the second requirement regarding a non-

4

governmental defendant, the plaintiff must show the defendant's conduct is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982); *see also Filarsky v. Delia,* 566 U.S. 377, 384, 132 S. Ct. 1657, 182 L. Ed. 2d 662 (2012). According to *Lugar,* "fair attribution" requires the plaintiff to show: (1) the deprivation was caused by the exercise of a state-created right or privilege, by a state-imposed rule of conduct, or by a person for whom the state is responsible; and (2) the party charged with the deprivation may be fairly described as a state actor. 457 U.S. at 937.

With regard to bail bondsmen, most courts have concluded that the first requirement under *Lugar* is satisfied when state law authorizes bail bondsmen to effect arrests of their principals (the individuals for whom they posted bond) for purposes of returning them to detention. *See Landry v. A-Able Bonding, Inc.,* 75 F.3d 200, 204 (5th Cir. 1996) (explaining that first prong of *Lugar* test is satisfied because Louisiana law permitting bail bondsman to make arrests was a privilege created by the State); *Green v. Abony Bail Bond,* 316 F. Supp. 2d 1254, 1259 (M.D. Fla. 2004) (holding first *Lugar* requirement was met where Florida law heavily regulates bail bondsmen and authorizes them to effect arrests); *Weaver v. James Bonding Co., Inc.*, 442 F. Supp. 2d 1219, 1223 n.6 (S.D. Ala. 2006) (concluding first prong of *Lugar* satisfied where bail bondsmen effected arrest pursuant to state-issued arrest warrant and as authorized by state law); *Tirreno v. Mott,* 453 F. Supp. 2d 562, 568 (D. Conn. 2006) (holding first prong of *Lugar* met because bail bondsmen acted pursuant to Connecticut common law privilege in entering plaintiffs' home); *McGregor v. Shane's Bail Bonds,* 2010 WL 3155635, at *13 (D. Kan. Aug. 9, 2010) ("The first element of *Lugar* is satisfied, as 'a bondsman has both a statutory and common law right to arrest his fugitive' under Kansas law.")

Tennessee law regulates professional bail bondsmen, *see* Tenn. Code Ann. §§ 40-11-301, *et seq.,* and specifically authorizes them to arrest their principals without a warrant. Tenn. Code

5

Ann. §§ 40-11-133; 40-11-134. State law also provides that bondsmen are entitled to the aid of the sheriff in any county in effecting an arrest. Tenn. Code Ann. § 40-11-134. In addition, both Defendants Robertson and Butler testified they were exercising powers conferred on them by state law in their quest to apprehend Mr. Staggs when they took the actions challenged here. (Deposition of Harold Robertson, at 20-21, 46-48, 140 (Doc. No. 84-6)[1]; Deposition of David Butler, at 17,

---

[1]  According to Defendant Robertson, Tennessee law grants bondsmen and bounty hunters more authority than law enforcement:

> A.  . . . The bounty hunters and bondsmen has got a lot more authority as far as arresting somebody than the police department.

> * * *

> A.  If you go to hunt somebody, they're in this particular house, the sheriff's department has to have a warrant. The bounty hunter can kick the door down and go in and get them; that's the difference. That's part of the difference.

> Q.  Why is that?

> A.  I don't know. It's law is all I know to tell you. It's some of these people that makes these laws.  I guess, that made it. That's what I'd say.

> * * *

> Q.  What does Wayne County say about that? What does the sheriff's department here say about that?

> A.  Well, they know it's that away. They will tell you that you've got more authority than they have as far as going in a house.

> * * *

> Q.  And that's because he's [a law enforcement officer] got to have a search warrant to get into somebody's house?

> A.  He's got to have a search warrant where I don't.

> Q.  Why do you think he's got to have a search warrant but you don't?

> A.  I wouldn't know about that, that's some of the laws.

(Robertson Deposition, at 47-48).

6

20-23, 52-54 (Doc. No. 84-7)). Therefore, the bail bondsmen defendants in this case were relying on state-created authority when they engaged in the challenged conduct in their efforts to apprehend Mr. Staggs. *See Brady v. Maasikas,* 2006 WL 1288608, at *2 (M.D. Tenn. May 9, 2006) (holding bail bondsmen were exercising powers under these Tennessee statutes in seeking to apprehend their principal); *Evans v. City of Etowah,* 2007 WL 1143948, at *4 (E.D. Tenn. Apr. 17, 2007) (same). Plaintiffs have established the first requirement under *Lugar.*

As for the second *Lugar* requirement, a majority of courts that have considered the issue hold that bail bondsmen should be deemed "state actors" when they act in concert with police officers, or in some other way attain state authority. *Landry,* 75 F.3d at 204; *Tirreno,* 453 F. Supp. 2d at 568; *Brady,* 2006 WL 1288608, at *2; *Weaver,* 442 F. Supp. 2d at 1226; *Evans,* 2007 WL 1143948, at *3; *McGregor,* 2010 WL 3155635, at *13; *cf. Jackson v. Pantazes,* 810 F.2d 426, 429 (4th Cir. 1987) (finding bail bondsmen to be state actors because they act as unofficial agents of the state). When they act unilaterally in apprehending their principals, without any assistance from law enforcement officials, however, courts have found them not to be state actors. *See, e.g., Brady, supra; Evans,* 2007 WL 1143948, at *3 n.6.

Plaintiffs have presented evidence in this case, primarily the defendants' own testimony, that the bondsmen defendants did not act unilaterally. Defendant Robertson testified that, on several occasions before the incidents challenged here, he called Wayne County Sheriff's Deputies Dusty Malugen and Donnie Carroll on their cell phones to advise them of his intent to search for a principal who had failed to appear for a court proceeding. (Robertson Deposition, at 98-99, 138; Deposition of Donnie Carroll, at 20 (testifying that Robertson calls him "frequently;" and has called "several times" in connection with apprehending individuals) (Doc. No. 84-4); Deposition of Dusty Malugen, at 41-42 (estimating Robertson has called him 10 to 15 times) (Doc. No. 84-

7

5)). And on both occasions at issue here, December 20, 2017 and December 27, 2017, Defendant Robertson called Deputy Carroll on his cell phone before visiting the plaintiffs' home. (Robertson Deposition, at 99-100, 105-06; Carroll Deposition, at 9-11). Defendant Robertson called Deputy Carroll a second time on December 27, 2017, during the course of the alleged search and detention by the private defendants, advised him that one of the bounty hunters had found "marijuana, guns and stuff upstairs of this house," and asked him to come to the scene. (Robertson Deposition, at 122-26; Carroll Deposition, at 22-23; White Deposition, at 42-43). At the direction of Deputy Carroll, Defendant Robertson then called Deputy Malugen on his cell phone and told him what the bounty hunter had found. (*Id.*) While waiting for Deputy Malugen to arrive, according to Defendant Robertson, the search continued. (Robertson Deposition, at 127-28). Deputy Malugen arrived approximately 25 minutes later, while the plaintiffs were still being detained by the bondsmen and the armed bounty hunters. (Robertson Deposition, at 129; Malugen Deposition, at 51-53; William White Deposition, at 89).

Deputy Malugen did not question the presence or activities of the bondsmen and bounty hunters when he arrived; instead, he was joined by one of the bounty hunters in his search of the plaintiffs' home, and asked the other bounty hunter to witness a "consent" form. (Robertson Deposition, at 134-36; Malugen Deposition, at 60, 65, 68-70, 128-31). Deputy Malugen even directed one of the bondsmen, Defendant Butler, to meet Deputy Carroll in his vehicle in order to show him where the plaintiffs lived. (Robertson Deposition, at 135-36; Carroll Deposition, at 41).

When he arrived, Deputy Carroll was escorted onto the property by Defendant Butler, and participated in the search and questioning of Mr. White. (Robertson Deposition, at 129, 135; Malugen Deposition, at 75-76; Carroll Deposition, at 40-42). Sometime later, the deputies arrested Mr. White and seized marijuana and guns. (Roberson Deposition, at 138; Carroll Deposition, at

8

62-63). It is unclear which of the seized items were initially discovered by the bounty hunters, and which were discovered by Deputy Malugen and/or Deputy Carroll. (Carroll Deposition, at 53 ("Q. Did Investigator Malugen tell you what he found and what the bounty hunters found? Did he differentiate between what he found and what they found? A. He did not. He just told me that they found – they found marijuana and guns."); Robertson Deposition, at 135; Malugen Deposition, at 58, 63-64, 71-73; Butler Deposition, at 35).

In addition, the bondsmen defendants suggested to the plaintiffs that they were connected with law enforcement in their interactions with them on December 27, 2017. When they arrived at the plaintiffs' home that day, the bounty hunters (who had been hired by the bondsmen) carried firearms and a taser, wore bulletproof vests with "Fugitive Recovery Team" written on them, wore "badges," and called out "Wayne County Police Department" when they entered the house. (Carroll Deposition, at 59-60; Malugen Deposition, at 53; Robertson Deposition, at 112-13, 144-46; Butler Deposition, at 45-46; Deposition of William White, at 24, 29, 31-33, 37, 40 (Doc. No. 84-1); Deposition of Bernice White, at 21, 38 (Doc. No. 84-2); Deposition of Tiffany Jones, at 13-14 (Doc. No. 84-3)). They used that authority, as well as intimidation, to enter the plaintiffs' home; to order the plaintiffs, who were not yet fully dressed, to gather and sit in the living room and place their cell phones on the table; to question the plaintiffs about Mr. Staggs; and to conduct a search of their home and property. (William White Deposition, at 29-37, 40-41, 47, 66-67, 98-10; Bernice White Deposition, at 20-28; Jones Deposition, at 11-16). The defendants' argument that they were merely acting as good citizens in reporting illegal behavior is not supported by the undisputed facts in the record.

The bondsmen defendants have not established, as a matter of law, that they acted unilaterally for purposes of the Section 1983 claim. Accordingly, the motion for partial summary judgment filed by the bondsmen defendants is denied.

## C.    Defendant Donnie Carroll's Motion for Summary Judgment

### 1.   Qualified Immunity (Counts Two and Three)

Defendant Carroll argues he is shielded from further litigation on Plaintiffs' Section 1983 claims by qualified immunity. Qualified immunity shields government officials who perform discretionary functions from standing trial for civil liability unless their actions violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). Once qualified immunity is raised by a defendant, the plaintiff bears the burden of overcoming the qualified-immunity defense. *Id.* In analyzing the defense at the summary judgment stage, the court must view the facts in the light most favorable to the plaintiff and determine: (1) whether the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the incident to the extent that a reasonable person in the defendant's position would know the conduct complained of was unlawful. *Id.; Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). The court may exercise discretion in determining in which order to address the questions. *Id.,* at 648; *Pearson v. Callahan*, 555 U.S. 223, 236-37, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

A right is "clearly established" when the "'contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Morrison v. Bd. of Trs. of Green Twp.* 583 F.3d 394, 400 (6th Cir. 2009)). The Supreme Court has emphasized that "the clearly established right must be defined with specificity" and not at a "'high

10

level of generality.'" *City of Escondido v. Emmons*, ___U.S. ___, 139 S. Ct. 500, 503, 202 L. Ed. 2d 455 (2019) (quoting *Kisela v. Hughes*, ___U.S. ___, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018)). While there need not be "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152. To determine whether the law is clearly established, the Sixth Circuit "look[s] first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits.'" *Vanderhoef*, 938 F.3d at 279 (quoting *Guertin v. State,* 912 F.3d 907, 932 (6th Cir. 2019)).

Summary judgment based on qualified immunity is inappropriate if there is a disputed material fact as to whether an officer committed acts that would violate a clearly established right, or if the reasonableness of the officer's action depends on disputed facts. *Graves v. Malone*, 810 Fed. Appx. 414, 419-20 (6th Cir. 2020). "If the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate." *Tlapanco,* 969 at 648.

a. Fourth Amendment Claim (Count Two)

Through Count Two, Plaintiffs claim the defendants violated their Fourth Amendment right to be free from unreasonable search and seizure. The Supreme Court has explained that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States Dist. Ct.,* 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972). For that reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez,* 540 U.S. 551, 559, 124 S. Ct. 1284, 157 L. Ed. 2d 1068 (2004). Thus, a warrantless search or seizure inside a home by a law enforcement officer

11

violates the Fourth Amendment unless an exception to the warrant requirement applies. *Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 854 (6th Cir. 2012).

The exception to the warrant requirement invoked by Defendant Carroll is consent. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). In order to be valid, consent must be "'voluntary, unequivocal, specific, intelligently given, and uncontaminated by any duress and coercion.'" *United States v. Gray*, 834 Fed. Appx. 146 (6th Cir. 2020) (quoting *United States v. Alexander,* 954 F.3d 910, 918 (6th Cir. 2020)). Whether an individual provided valid consent is a question of fact to be determined from a totality of the circumstances. *Id.* The factors courts consider in determining voluntariness include: "'the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.'" *United States v. Blomquist*, 976 F.3d 755, 759 (6th Cir. 2020) (quoting *United States v. Elkins*, 300 F.3d 638, 647 (6th Cir. 2002)).

Defendant Carroll does not suggest that he obtained consent directly from the plaintiffs when he entered their home and conducted a search. (Doc. No. 70, at 10). Rather, Defendant Carroll argues he is entitled to rely on the written consent obtained by Defendant Malugen through the doctrine of "consent once removed" and the "collective knowledge" doctrine.

The "consent once removed" doctrine allows government agents to "'enter a suspect's premises *to arrest* the suspect without a warrant if [undercover agents]: 1) entered at the express invitation of someone with authority to consent; 2) at that point established the existence of probable cause to effectuate an arrest or search; and 3) immediately summoned help from other officers.'" *O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 731 (6th Cir. 2011)

(quoting *United States v. Yoon,* 398 F.3d 802, 806 (6th Cir.2005)).  The doctrine is "'based upon the theory that, because an undercover agent or informant who establishes probable cause to arrest the suspect may in fact arrest him then and there, he should be entitled to call in the agents with whom he is working to assist in the arrest.'" *Id.*, at 732 (quoting *Yoon,* 398 F.3d at 809-10). "Only then may officers 'seize anything in plain view and . . . conduct a protective sweep, but they may not conduct a general search without first satisfying the ordinary requirements of consent, a warrant, or exigent circumstances, which excuse the failure to obtain a warrant.'" *Id.* (quoting *Yoon,* 398 F.3d at 806 n. 1). The doctrine does not apply where the second set of officers "did not – after the undercover officers exited – rush in to help effectuate an arrest." *Id.*

The "consent once removed" doctrine does not apply here for several reasons. First, the doctrine does not permit officers to conduct a general search; it permits them only to effectuate an *arrest*. Deputy Carroll's own testimony indicates that he did not enter the plaintiffs' home simply to effectuate an arrest. Rather, after entering the plaintiffs' home, Deputy Carroll asked Mr. White to accompany him upstairs, questioned Mr. White, made phone calls, and seized evidence. (Carroll Deposition, at 42-44, 46-49, 54, 61). In addition, Deputy Carroll did not *immediately* respond after his phone conversation with Deputy Malugen, as is required for the doctrine to apply. Indeed, Deputy Carroll was not even on the premises when he spoke with Deputy Malugen. (Carroll Deposition, at 40). Finally, application of the doctrine depends on the validity of the consent Deputy Malugen purportedly obtained (*i.e.,* the first officer must have entered at the express invitation of someone with authority to consent), an issue that is the subject of a factual dispute. Mr. and Mrs. White testified they never invited Deputy Malugen into their home, and that he entered while they were being detained by the bondsmen and bounty hunters. (William White

Deposition, at 53-54, 89; Bernice White Deposition, at 71-72).[2] The plaintiffs also contest that Mr. White's subsequent execution of the "consent to search" form was "voluntary." The plaintiffs testified that Mr. White signed the form only after Deputy Malugen told him, if he did not sign it, they would be detained for another hour while he obtained a search warrant, and once he obtained the search warrant, he would then arrest Mr. White, along with his wife and his stepdaughter. (William White Deposition, at 58-59; Bernice White Deposition, at 37; Jones Deposition, at 18). Deputy Malugen was then assisted in his search by one of the bounty hunters. (Robertson Deposition, at 135).

Deputy Malugen testified, on the other hand, that Mr. White, while sitting on the couch, invited him to enter the plaintiffs' home. (Malugen Deposition, at 51-52, 56-57, 114-15). Deputy Malugen denies making any statement to Mr. White about what would happen if Mr. White refused to sign the consent form. (*Id.*) Given these disputed factual issues, Deputy Carroll has not established the "consent once removed" doctrine defeats the Fourth Amendment claim.[3]

The "collective knowledge" doctrine, as recognized by the Sixth Circuit, permits an officer to conduct a stop based on information he or she obtained from fellow officers. *See, e.g., Bey v.*

---

[2]  To the extent the defendant argues the plaintiffs were no longer detained once the bounty hunters stopped pointing their guns at the plaintiffs' bodies, he has not cited any support for that proposition.

[3]  The Court notes that the defendants have not addressed their initial entry onto the property through two locked gates, which may also affect the validity of the search. On December 27, 2017, the bondsmen and bounty hunters were apparently assisted by a third party, who had a key, in unlocking the gates; Deputy Malugen entered sometime later but can not recall whether the gates were open or closed; and Deputy Carroll was escorted onto the property by one of the bondsmen. (Robertson Deposition, at 106-08; Butler Deposition, at 64; Malugen Deposition, at 79; Carroll Deposition, at 41; William White Deposition, at 22-24, 90-91). Mrs. White testified that she was startled by the presence of the defendants at her door, in part, because she knew the gates were always locked. (Bernice White Deposition, at 14, 17-18, 20 (". . . I heard somebody beating on my back door and it scared me because, like I knew the gate was locked, and all I thought was something has happened to somebody in my family.")).

14

*Falk*, 946 F.3d 304, 316 (6th Cir. 2019). For the doctrine to apply, certain preconditions must be met: "'(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it.'" *Hart v. Hillsdale Cty., Michigan*, 973 F.3d 627, 640 (6th Cir. 2020) (quoting *United States v. Lyons*, 687 F.3d 754, 767 (6th Cir. 2012)).

Defendant Carroll has not cited any authority in which the Sixth Circuit has applied the collective knowledge doctrine as a basis for a general warrantless search of a home.[4] Assuming the "collective knowledge" doctrine applies to the search of the plaintiffs' home in this case, however, the second precondition requires the first officer to have met the legal requirements justifying the search. Therefore, as with the "consent once removed" doctrine, Deputy Carroll must show that the consent given to Deputy Malugen was valid. For the reasons described above, there are factual disputes surrounding the validity of that consent. Given these disputed factual issues, Deputy Carroll has not established that the "collective knowledge" doctrine defeats the Fourth Amendment claim.

Relying on *Humphrey v. Mabry,* 482 F.3d 840 (6th Cir. 2007), Deputy Carroll alternatively argues that, even if Deputy Malugen did not obtain a valid consent, Deputy Carroll is still entitled to qualified immunity because his actions were, nevertheless, objectively reasonable. In

---

[4] The Eighth Circuit case cited by Defendant Carroll, *United States v. Gillette,* 245 F.3d 1032, 1034 (8th Cir. 2001), involves consent to the search of a vehicle. In *Gillette,* the court determined that a homeowner's consent to search the defendant's vehicle, which was parked on the homeowner's property, was validly given to Detective Kriteman. 245 F.3d at 1033. The court went on to apply that valid consent to the search of the vehicle conducted by Deputy Smithson, who was a member of the investigative team. 245 F.3d at 1034.

15

*Humphrey,* the court held that, even though the defendant officers violated the plaintiff's Fourth Amendment rights when they relied on inaccurate information from dispatchers in stopping the plaintiff, the right at issue was not "clearly established" because the defendant officers relied in good faith on the report of other officers that an armed suspect was fleeing the scene of a crime. *Id.,* at 847-48. Given the "fast-moving night-time scenario," the court concluded it was reasonable for the officers to point their guns at the suspect, remove him from his car, and restrain him without stopping to obtain a more complete description. *Id.,* at 850.

The "reasonableness" of Deputy Carroll's conduct here, however, depends on the inferences to be drawn from certain undisputed facts, and the version of the disputed facts that will ultimately be accepted by the jury. *See Bolick v. City of E. Grand Rapids,* 580 Fed. Appx. 314, 322 (6th Cir. 2014) (explaining that the defendant's qualified immunity argument "asks us to view the facts in a light most favorable to the officers, which we cannot do."). Plaintiffs have adduced evidence upon which a jury could find Deputy Carroll's actions were not objectively reasonable. For example, the jury could find a reasonable officer would have investigated the legitimacy of the presence of the bondsmen/bounty hunters on the plaintiffs' property before joining them and taking further action. After receiving the first call from Defendant Richardson, on December 27, 2017, Deputy Carroll knew that, in their search for Mr. Staggs, the bondsmen/bounty hunters intended to visit the home of a third party, not the home of Mr. Staggs. (Carroll Deposition, at 10-12). And even though he did not believe Mr. Staggs would be at Mr. White's house, Deputy Carroll did not convey that opinion to Defendant Robertson. (*Id.*). After receiving the second call from Defendant Robertson, Deputy Carroll knew the bondsmen/bounty hunters had found marijuana, and though he "didn't ask" how the marijuana was found, he presumably understood a search of the third party's home had occurred. (*Id.,* at 22).

16

When he eventually arrived at the property, Deputy Carroll was granted access, not by the plaintiffs or even Deputy Malugen, but by one of the bondsmen. (*Id.,* at 41-42). Upon entering the house (without requesting permission), Deputy Carroll found the plaintiffs, in nightclothes, sitting in the living room, with their cell phones on the table. (*Id.,* at 42-44). Deputy Carroll was also aware the bounty hunters wore bulletproof vests, badges, and could be mistaken for law enforcement. (*Id.,* at 51, 59-61). Yet, he did not ask whether the bondsmen/bounty hunters received permission to enter the property and the house, or were, instead, trespassers. He did not ask whether they received permission to search the house. He did not ask why the plaintiffs were sitting in the living room, in nightclothes, with their cell phones on the table. And he did not ask the bounty hunters for credentials, or for gun permits. Unlike *Hunphrey,* the evidence here does not suggest a "fast-moving night-time scenario," risk to the safety of third parties, or other exigencies, that might prevent a reasonable officer from asking such questions.[5]

In addition, there remain certain facts that are disputed by the parties. For example, the witnesses disagree as to whether the bounty hunters were in the room with the plaintiffs, or outside the house, when Deputy Carroll arrived. (Carroll Deposition, at 41; William White Deposition, at 64-65, 107). In addition, the plaintiffs describe a harrowing experience made worse by the deputies' tacit approval of, or at the very least, their failure to investigate the conduct of the bondsmen/bounty hunters. On the other hand, Deputy Carroll testified the plaintiffs were "laughing and giggling" while he was there, and offering their visitors fudge to eat. (*Id.,* at 58-59).

---

[5] The absence of urgency or concerns about officer safety also distinguish this case from *White v. Pauly,* ___ U.S. ___, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017), cited by Deputy Carroll, where the Supreme Court reversed the denial of qualified immunity to an officer who arrived late at an ongoing police action, and after witnessing shots being fired by the occupants of a house, shot and killed one of the occupants.

Given the state of the record, as outlined herein, the Court concludes the reasonableness of Deputy Carroll's actions must be considered by a jury.

Deputy Carroll also argues he is entitled to qualified immunity on the detention (or "seizure") aspect of Plaintiffs' Fourth Amendment claim. "For purposes of the Fourth Amendment, an encounter between an officer and a citizen becomes a seizure when the officer restrains the person's freedom of movement 'by means of physical force or a show of authority.'" *United States v. Lewis,* \_\_\_ Fed. Appx. \_\_\_, 2021 WL 246280, at *3 (6th Cir. Jan. 26, 2021) (quoting *United States v. Mendenhall,* 446 U.S. 544, 553, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)). The test for determining whether a seizure has occurred is whether, in view of all the circumstances, a reasonable person would have believed he was not free to leave, or was not free to decline the officers' requests or otherwise terminate the encounter. *Brendlin v. California,* 551 U.S. 249, 255, 127 S. Ct. 2400, 2405-06, 168 L. Ed. 2d 132 (2007); *United States v. Williams,* 615 F.3d 657, 663 (6th Cir. 2010).

Deputy Carroll argues he is not liable for any detention of the plaintiffs because they were already being detained in their living room by the bounty hunters/bondsmen when he arrived. Plaintiffs contend, on the other hand, that Deputies Malugen and Carroll participated in their detention.

An officer's mere presence at the scene of allegedly unconstitutional conduct will not subject the officer to liability absent a showing of direct responsibility. *See Alexander v. Carter for Byrd,* 733 Fed. Appx. 256, 262 (6th Cir. 2018). Where the officer takes an active role in the conduct, however, he is no longer considered to be a mere passive observer. *Id.; see also Peatross v. City of Memphis,* 818 F.3d 233, 242 (6th Cir. 2016) (explaining that police supervisor may be held liable if he either encouraged the specific incident of misconduct or in some other way directly

18

participated in it); *Hensley v. Gassman,* 693 F.3d 681, 688-694 (6th Cir. 2012) (explaining that active participation or facilitation of private repossession of collateral by police can transform repossession into Fourth Amendment seizure); *Thomas v. Cohen,* 304 F.3d 563, 575 (6th Cir. 2002) (holding that officers who escorted tenants from premises based only on owner's allegation they were subject to eviction were "active participants" in the Fourth Amendment violation).

Plaintiffs contend that Deputy Carroll was more than merely present while they were being detained. Plaintiffs argue their detention continued after Deputy Carroll's arrival at their home, and presumably, with his tacit approval, as he assisted his subordinate, Deputy Malugen, in the search for and seizure of evidence. As discussed above, after arriving at the plaintiffs' property, Deputy Carroll encountered the bondsmen/bounty hunters, and found the plaintiffs, in nightclothes, sitting in the living room, with their cell phones on the table. (Carroll Deposition, at 42-44, 51, 59-61). Deputy Carroll subsequently asked Mr. White to follow him upstairs, questioned Mr. White about the contraband in his home and other topics, and assisted Deputy Malugen in carrying the contraband to their cars. (*Id.,* at 44-48, 54, 61-62; Malugen Deposition, at 74-78; Robertson Deposition, at 135-36). At some point, Deputy Malugen arrested Mr. White and transported him to the jail. (Carroll Deposition, at 61-62).

Deputy Carroll does not suggest he arrived on the scene and attempted to end the detention by telling the plaintiffs they were free to terminate the encounter, or that they were free to decline his request to continue the search (and seizure) inside their home. For these reasons, Deputy Carroll has not shown, based on undisputed facts, that he was uninvolved in the detention aspect of Plaintiffs' Fourth Amendment claim.

Deputy Carroll alternatively argues that, even if Plaintiffs were detained after he arrived, his knowledge that marijuana was present in the plaintiffs' home provided probable cause or

19

reasonable suspicion justifying the detention.[6] As a general rule, law enforcement officers are not entitled to rely on information obtained through violation of a person's Fourth Amendment rights, however, to establish probable cause or reasonable suspicion. *See, e.g., United States v. Wells*, 690 Fed. Appx. 338, 343 (6th Cir. 2017). When such information is "the fruit of illegal conduct," a multi-factor analysis is necessary to determine whether the connection between the illegal conduct and the evidence subsequently obtained has "'become so attenuated as to dissipate the taint.'" *Id. (*quoting *Brown v. Illinois*, 422 U.S. 590, 598, 95 S. Ct. 2254, 2259, 45 L. Ed. 2d 416 (1975)). The attenuation analysis requires consideration of voluntariness, temporal proximity, intervening circumstances, and "the purpose and flagrancy" of the violation. *Id*., at 344.

As discussed above, Plaintiffs have presented evidence that Deputy Carroll was aware of (or should have asked questions about) the Fourth Amendment violations committed by the bondsmen/bounty hunters and Deputy Malugen that led to discovery of the marijuana. Deputy Carroll has not addressed how the attenuation analysis applies to his conduct, and the Court declines to address the issue in the absence of adequate briefing.

---

6    Under *Terry v. Ohio,* 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), law enforcement officers "may briefly detain a person for investigative purposes so long as it is 'reasonable.'" *See also United States v. Young,* 707 F.3d 598, 603 (6th Cir. 2012). The Sixth Circuit applies a two-part analysis in determining whether a *Terry* stop is reasonable: first, the court asks whether there was reasonable suspicion to initiate the stop; and second, whether the stop was reasonable in scope. *Id.*

Whether officers have probable cause for an arrest requires a court to "'determine whether at that moment the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that a suspect had committed or was committing an offense.'" *United States v. Stubblefield*, 682 F.3d 502, 508 (6th Cir. 2012) (quoting *United States v. Smith*, 549 F.3d 355, 359 (6th Cir. 2008)). The court is to view the facts and circumstances of the arrest from the viewpoint of an objectively reasonable police officer. *Id.*

For these reasons, Deputy Carroll's request for summary judgment on Count Two based on qualified immunity grounds is denied.

      b.  <u>Fourteenth Amendment (Count Three)</u>

Defendant Carroll argues he is also entitled to qualified immunity on Plaintiffs' Fourteenth Amendment claim. The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. The Due Process Clause of the Fourteenth Amendment has both a procedural and a substantive component. *Range v. Douglas,* 763 F.3d 573, 588 (6th Cir. 2014). To state a procedural due process claim, a plaintiff must show: (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of the protected interest; and (3) the defendant did not afford him adequate procedural rights. *Daily Servs., LLC v. Valentino,* 756 F.3d 893, 904 (6th Cir. 2013). Substantive due process is "'[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range,* 763 F.3d at 588 (quoting *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1216 (6th Cir.1992)). "It protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Id.*

In Count Three, Plaintiffs allege Defendants Malugen and Carroll (and dismissed defendants Wayne County Sheriff's Department and Sheriff Ric Wilson) were "grossly negligent" and "willful" and engaged in "malicious acts and omissions, recklessness, conscious and deliberate indifference to Plaintiffs' rights," and as a result, Plaintiff's were deprived of their Fourteenth Amendment rights. (Doc. No. 1 ¶ 79).

In their Response (Doc. No. 82, at 18-20) to the defendant's motion, Plaintiffs describe their claim as follows: Tennessee Code Annotated Section 40-11-133 violates the Fourth Amendment because it allows bondsmen to enter onto private property to apprehend a fugitive. Deputy Carroll "in facilitating the Defendant bondsmen acting pursuant to this state statute, gives rise to Plaintiffs' claims that they have been deprived" of their Fourth Amendment rights. (*Id.,* at 20). In addition, Plaintiffs argue Defendant Carroll's "implicit authorization of the Defendant bondsmen and bounty hunters operating under this unconstitutional statute shocks the conscience by the very facts alleged – that private individuals can have their homes, lives, papers, and effects seized without due process of law for any meaningful hearing." (*Id.*)

Plaintiffs cite *Hardrick v. City of Detroit,* 876 F.3d 238 (6th Cir. 2017) to support their claim. In *Hardrick,* the plaintiff dog owners sued the city of Detroit and its director of animal control alleging that an ordinance permitting warrantless searches of houses and homes violated the Fourth Amendment, and that the city had a policy of depriving owners of their pets without due process. The plaintiffs alleged the due process violations occurred in two ways: (1) a denial of process before the officers placed their pets in the city's animal shelter, where the pet became sick and/or died; and (2) a denial of process after the pets were seized that would have enabled the plaintiffs to contest the seizures. 876 F.3d at 247. As to the first claim, the court held the alleged conduct constituted negligence, which is insufficient to support a due process deprivation. *Id.* As to the second claim, the court held the plaintiffs had failed to show the state offered no statutory or common law remedy, and pointed out that Michigan tort law allows recovery for harm to animals. *Id.*

Plaintiffs' allegations here regarding the statute's facilitation of the Fourth Amendment violation does not explain how Plaintiffs were deprived of their *due process* rights by Deputy

Carroll. To the extent such a claim could be viable under the Fourteenth Amendment, Plaintiffs have not shown that it was so "clearly established" that a reasonable officer would know he was violating that right.

Plaintiffs' argument that the defendants' behavior "shocks the conscience" appears to assert a substantive due process violation. As the Sixth Circuit has held, however, where there is an enumerated constitutional right available to protect against the conduct alleged to "shock the conscience," a substantive due process claim may not be based on the same conduct. *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 548 (6th Cir. 2012). Here, the conduct alleged to be shocking – that private individuals can have their homes, lives, papers, and effects seized – is protected by the Fourth Amendment. Thus, Plaintiffs have not shown that a Fourteenth Amendment violation may be based on that same behavior. Alternatively, to the extent such a claim could be viable under the Fourteenth Amendment, Plaintiffs have not shown that it was so "clearly established" that a reasonable officer would know he was violating that right.

Accordingly, Defendant Carroll is entitled to summary judgment as to Count Three on qualified immunity grounds.

2. Civil Conspiracy (Count Eight)

Through Count Eight of the Complaint, Plaintiffs allege the bondsmen defendants, Deputies Carroll and Malugen (and the dismissed bounty hunter defendants) engaged in a civil conspiracy to commit the torts alleged in the Complaint. (Doc. No. 1 ¶¶ 98-99). Defendant Carroll argues he is entitled to summary judgment on this claim because there is no evidence of an agreement to conduct an illegal search at the plaintiffs' home.[7]

---

[7]    Defendant Carroll points out that Plaintiffs cited 42 U.S.C. § 1985 in the "Introduction" paragraph of their Complaint, but did not cite the statute in asserting their civil conspiracy claim in Count Eight. (Doc.

A civil conspiracy is "an agreement 'between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.'" *First Cmty. Bank, N.A. v. First Tennessee Bank, N.A.,* 489 S.W.2d 369, 395 (Tenn. 2015) (quoting *Chenault v. Walker*, 36 S.W.3d 45, 52 (Tenn. 2001)). Civil conspiracy "extend[s] liability in tort beyond the active wrongdoer to those who planned, assisted, or encouraged the wrongdoer's acts." *Stanfill v. Hardney,* 2007 WL 2827498, at \*7 (Tenn. Ct. App. Sept. 27, 2007). To establish a civil conspiracy, a plaintiff must show: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006); *Pagliara v. Moses*, 2020 WL 838482, at \*6 (Tenn. Ct. App. Feb. 20, 2020).

The conspirators' agreement "'need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.'" *First Cmty. Bank,* 489 S.W.3d at 396 (quoting *Dale v. Thomas H. Temple Co.,* 186 Tenn. 69, 208 S.W.2d 344, 354 (Tenn. 1948)). The agreement "may be implied from the conspirators' conduct itself. *Stanfill,* 2007 WL 2827498, at \*8. Each conspirator must have the intent to accomplish the common purpose, however, and each conspirator must know of the other conspirator's intent. *First Cmty. Bank,* 489 S.W.3d at 396. A conspirator may be found liable "'if he or she understands the general objectives of the scheme, accepts them, and agrees, either explicitly or implicitly, to do his or her part to further them.'" *Id.* (quoting *Stanfill,* 2007 WL 2827498, at \*8). Civil conspiracies are typically proven by circumstantial evidence, and fact-finders "'may consider the nature of the

---

No. 1). As Plaintiffs do not reference Section 1985, or any other federal law, in their Count Eight allegations, the Court construes their claim as arising solely under state law.

acts themselves, the relationship of the parties, the interests of the conspirators, and other circumstances.'" *Id.* (quoting *Stanfill, supra*).

Deputy Carroll has not analyzed this claim in conjunction with the underlying torts alleged in the Complaint, and the underlying torts inform the determination of whether there is evidence of an agreement to commit the particular tort at issue. The Court will assume, therefore, that the defendant contends there is no evidence of an unlawful agreement to commit *any* of the alleged torts. To support his argument, Deputy Carroll argues that he did not know, based on the first phone call with Defendant Robertson on December 27, 2017, that the bail bondsmen and bounty hunters intended to conduct an illegal search when they arrived at the plaintiffs' home. Deputy Carroll points out that, after receiving the second call from Defendant Robertson about the marijuana and firearms the bondsmen and bounty hunters had found at the plaintiffs' home, he told Deputy Malugen to respond, and directed him to obtain consent to enter and search. According to Deputy Carroll, he did not agree to a plan for anyone to conduct an illegal search at the plaintiffs' home.

Based on the evidence outlined above, however, the Court concludes that Plaintiffs have presented evidence from which a jury could find a tacit agreement by Deputy Carroll to join a conspiracy by the bondsmen/bounty hunters, at the latest, when he arrived on the scene and arguably continued the detention of the plaintiffs and the search of their home. *See Dale,* 186 Tenn. at 88 (explaining that, even if the co-defendant Potter became active in the conspiracy at some point after it began, the defendant is still liable as a co-conspirator). Thus, Deputy Carroll is not entitled to summary judgment on the civil conspiracy claim.

### 3. Common Law Qualified Immunity on Trespass Claim (Count Four)

Under Tennessee law, trespass is defined as the unauthorized entry upon another's real property. *Arbuckle v. City of Chattanooga*, 696 F. Supp. 2d 907, 931 (E.D. Tenn. 2010) (citing *Morrison v. Smith,* 757 S.W.2d 678, 681 (Tenn.Ct.App.1988)). Defendant Carroll argues he had consent to enter Plaintiffs' property based on the "consent once removed" doctrine and the doctrine of collective knowledge. As discussed above, however, neither doctrine supports summary judgment in light of the disputed issues of material fact underlying their application.

Defendant Carroll alternatively argues that he is entitled to summary judgment on this claim through application of common law qualified immunity. There are cases in Tennessee that have applied qualified immunity to state law torts. *See Youngblood v. Clepper,* 856 S.W.2d 405 (Tenn. Ct. App. 1993); *Luna v. White Cty.*, 2015 WL 4119766, at *5 (Tenn. Ct. App. June 29, 2015); *Rogers v. Gooding,* 84 Fed. Appx. 473, 477 (6th Cir. 2003) (recognizing *Youngblood's* application of immunity to state law torts). Qualified immunity in Tennessee appears to mirror that applied to federal Section 1983 claims. *Fowler v. Burns,* 447 Fed. Appx. 659, 663 (6th Cir. 2011). As explained above, disputed factual issues preclude summary judgment on qualified immunity grounds for Plaintiffs' Fourth Amendment claim. Those same issues preclude summary judgment on qualified immunity grounds for Plaintiffs' trespass claim as well.[8]

---

[8]    The weaknesses in the defendants' consent argument discussed in connection with the Fourth Amendment claim are likely to be of concern to Tennessee courts considering Plaintiffs' state law claims. The Tennessee Supreme Court recently held that officers searching for an individual with outstanding warrants were not justified by exigent circumstances in searching the defendant's home for the individual, and had not established the defendant's consent, given at gunpoint after a lengthy detention and repeated requests, was voluntary. *State v. Scott,* ___ S.W.3d ___, 2021 WL 684238, at *6-7 (Tenn. Feb. 23, 2021).

26

## IV. CONCLUSION

For the reasons set forth below, the Motion for Partial Summary Judgment filed by Defendants Harold Robertson, Harold Robertson and Associates Bail Bonding, and David Butler (Doc. No. 68) is **DENIED**; and Defendant Donnie Carroll's Motion for Summary Judgment (Doc. No. 69) is **GRANTED** in part, and **DENIED** in part. The Court grants summary judgment to Defendant Carroll on Count Three. All other claims remain for trial.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE